IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

RUTH ANNE LICHTER, INDIVIDUALLY AND AS
SPECIAL ADMINISTRATOR OF THE ESTATE OF
TIMOTHY E. LICHTER,

          Plaintiff                                   CASE NO.:

v.

MERCK & CO., INC., PFIZER INC. and                COMPLAINT
PHARMACIA CORPORATION.,        Personal Injury Action (28 U.S.C. §1332)

          Defendants.                            Demand For Jury Trial

## I. PARTIES

1.  Ruth Anne Lichter is the Special Administrator of the Estate of Timothy E. Lichter, deceased. Timothy E. Lichter died in Wisconsin on May 29, 2004.

2.  At all times material hereto, Ruth Anne Lichter, Special Administrator of the Estate of Timothy E. Lichter, deceased and Plaintiff's Decedent, Timothy E. Lichter, is and were citizens and residents of the State of Wisconsin, residing at 6415 Larchmont Drive, Racine, Wisconsin, 53406.

3.  Ruth Anne Lichter, Special Administrator of the Estate of Timothy E. Lichter, deceased, was granted Letters of Administration by the Circuit Court of Racine County.

4.  Ruth Anne Lichter was the spouse of Decedent Timothy E. Lichter.  They were married on June 29, 1968.  Ruth Anne Lichter sues both individually and on behalf of the Estate of Timothy E. Lichter and, unless otherwise specifically set forth hereafter, both Ruth Anne Lichter and the Estate of Timothy E. Lichter are collectively referred to herein as the Plaintiff.

5.  Defendant Merck & Co., Inc. (hereafter "Merck") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.

6. At all times relevant hereto, Defendant Merck is authorized to do business and does do business in the State of New Jersey and State of Wisconsin, and was and continues to be engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical drug, Vioxx.

7. Defendant Pfizer Inc. (hereafter "Pfizer") is a Delaware corporation with its address and principal place of business at 235 East 42nd Street, New York, New York 10017.

8. At all times relevant hereto, Defendant Pfizer is authorized to do business and does do business in the State of New Jersey and State of Wisconsin, and was and continues to be engaged in the business of developing, manufacturing, promoting, marketing and distributing pharmaceuticals and other products, including the product known as Bextra.

9. Defendant Pharmacia Corporation (hereafter "Pharmacia") is a Delaware corporation with its address and its principal place of business at 100 Route 206 North, Peapack, New Jersey 07977, and is authorized to do business and does business in the State of New Jersey and State of Wisconsin.

10. At all times relevant hereto, Defendant Pharmacia was and continues to be engaged in the business of promoting, manufacturing, marketing, and distributing Bextra.

## II.    JURISDICTION AND VENUE

11. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §1332 as the litigants are citizens of different states or subjects of a foreign state and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

12. Venue is properly vested in this district pursuant to 28 U.S.C. §1391, as the Plaintiff resides in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred or transpired in this judicial district.

### III.  FACTUAL BACKGROUND

13.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

14.    Plaintiff's Decedent, Timothy E. Lichter, ingested Vioxx from approximately April 26, 2004 to approximately May 26, 2004.

15.    Plaintiff's Decedent, Timothy E. Lichter, ingested Bextra from approximately May 25, 2004 to May 29, 2004.

16.    On May 29, 2004, Plaintiff's Decedent, Timothy Lichter, cardiac arrested and died.

### A.  VIOXX

### 1.  Merck's Decision to Bet Its Future on Vioxx

17. In the late 1980's and early 1990's, Merck faced a crisis because patents on several of its major "blockbuster" drugs -- including Vasotec, Prinivil, Mevacor, Pepcid, Prilosec, and Zocor -- were expiring.  No pharmaceutical company had ever had this many billion-dollar drugs going off patent at approximately the same time.

18. Raymond Gilmartin  ("**Gilmartin**") became Merck's President and CEO in 1994.  Gilmartin, a Harvard-trained businessman, was the first non-doctor or non-scientist to run Merck since Merck's establishment in 1891.  At the time he admitted that, while the "safe thing would have been to seek a merger, emphasize generics, stay diversified and cut costs across the board," he "went against the conventional wisdom" and staked the company's future on the productivity of its labs.

19. Gilmartin sought to maximize short-term sales for Merck drugs such as Vioxx through marketing -- regardless of the serious and sometimes fatal risks to patients that would ultimately damage Merck's reputation and long-term financial health.

20. The appointment of Gilmartin signaled a culture change in Merck's focus from a science-driven to a marketing- and sales-driven company.  Other changes accompanied this shift.  For example, traditionally, Merck's marketing executives had not been allowed to participate in scientific-planning meetings.  Gilmartin's predecessor, P. Roy Vagelos, first persuaded scientists to accept the attendance of

marketers at such meetings by promising that they would not speak. Under Vagelos's, and then Gilmartin's, tenure, marketing personnel became more active participants in scientists' development decisions.

21. Dr. Edward Scolnick ("**Scolnick**"), President of Merck Research Laboratories, was aware of Gilmartin's intent to focus on development of profitable new drugs as the driving force for the success of the company. With financial analysts declaring that Merck might need to merge with another pharmaceutical company to avert or resolve a looming financial crisis, Scolnick feared that Merck might not survive as an independent company if new drugs were not discovered and put into the research and development pipeline.

22. Merck desperately needed a "blockbuster" drug to fill the revenue vacuum left by imminent patent expirations and to alleviate skepticism about the company's stability and future.

23. Vioxx was one such drug. In fact, in the latter half of the 1990's, the astonishing market success of Vioxx became so central to Merck's fortunes that Scolnick ultimately acknowledged that, had Merck not discovered and successfully shepherded the drug through the FDA approval process, it would have become a very different company.

**2. The Discovery of COX-2 Inhibitors and Vioxx**

24. Vioxx belongs to a class of drugs known as non-steroidal anti-inflammatory drugs or "NSAIDs", which are used to reduce pain and inflammation. NSAIDs generally reduce pain and inflammation by blocking the production of an enzyme called prostaglandin G/H synthase, which consists of two similar forms, cyclooxygenase-1 ("COX-1") and cyclooxygenase-2 ("COX-2"). Vioxx is a selective inhibitor of COX-2. Vioxx reduces inflammation and pain by selectively blocking the production of COX-2.

25. Other, older NSAIDs (including aspirin and ibuprofen), which inhibit COX-1 as well as COX-2, also effectively relieve pain and inflammation. In fact, Vioxx has never been shown to have any greater analgesic or anti-inflammatory efficacy than older, non-selective NSAIDs.

26. Because COX-1 inhibition can adversely affect the gastrointestinal tract, traditional NSAIDs have been associated with potentially serious gastrointestinal toxicity, including perforations of the gastrointestinal lining, ulcers, and gastrointestinal bleeding.

27. By the early 1990's Merck researchers believed that by specifically inhibiting only COX-2, they could reduce pain and inflammation while minimizing risk to the GI tract.

28. In or about the summer of 1992, Merck began a COX-2 research program at the Merck Frosst Centre for Therapeutic Research in Quebec, Canada, which eventually led to the discovery and development of a compound that became Vioxx.

29. On or about December 20, 1994, Merck filed an Investigational New Drug (IND) application with the FDA's Division of Anti-inflammatory, Analgesic and Opthalmic Drug Products (IND 46,894) to conduct clinical trials of Vioxx for the treatment of osteoarthritis and acute pain in humans.

### 3.  Merck's Knowledge of Vioxx Problems

30. As early as 1996, Merck knew that, because Vioxx inhibited COX-2 but not COX-1, use of the drug increased platelet aggregation (blood clotting) and thereby increased the risk of heart attacks and strokes.  Merck recognized that, as a result, use of Vioxx posed a substantial risk of significantly higher rates of adverse cardiovascular effects, particularly because, unlike aspirin, it lacked anti-platelet or anti-clotting properties.  In fact, Merck sponsored a study that demonstrated that Vioxx, in contrast to several other NSAIDs against which it was tested, exerted no appreciable anti-platelet effect (Protocol 061).

31. In or about February 1997, one Merck researcher, Briggs Morrison, conceded that "without COX-1 inhibition you will get more thrombotic events and kill drug [sic]."  Responding to this concern, Alise Reicin, now a Merck vice president for clinical research, observed:  "This is a no win situation! . . . [T]he possibility of increased CV [cardiovascular] events is of great concern (I just can't wait to be the one to present those results to senior management!)."

32. In or about 1997, based on a Merck-sponsored study (Protocol 023), Merck's own clinical investigators advised the company that by selectively inhibiting COX-2, Vioxx might actually provoke

the creation of blood clots by reducing levels of prostacyclin—a COX-2 platelet inhibitor—in blood vessels.  Thus, it appeared that Vioxx not only lacked the anti-platelet effect of aspirin and other NSAIDs that inhibited COX-1 production, but also promoted clotting by blocking COX-2 while leaving COX-1 generally uninhibited.

33. As a consequence of Protocol 023, these investigators, as well as other consultants, recommended that Merck sponsor and/or undertake additional studies in populations of patients already at heightened cardiovascular risk to investigate the prothrombotic potential of Vioxx, precautions Merck persistently refused to take.

34. By or about October 1997, analysts were closely watching the developments of Merck in COX 2 inhibitors, noting that Merck had several major drugs that would lose their patent protections after the year 2000, and that it needed a blockbuster drug to help take up the slack.  If Merck successfully developed a COX-2 inhibitor, such a drug would offer such blockbuster potential.

35. On or about October 24, 1997, Scolnick announced that Merck would discuss its drug pipeline at its December 1997 analyst meeting instead of waiting until the next biannual update in the Spring of 1998.  He sought to reassure investors that this pipeline would fill the revenue gap that would be created by upcoming patent expirations that would affect $5 billion of Merck's annual revenue (one-quarter of its total sales), stating:  "No company has ever had this many billion-dollar drugs going off patent at the same time.  But we have other products in the pipeline that over the next year at public meetings we hope to tell people about.  We won't say anything public until we have clear-cut results."

36. As promised, at Merck's December 1997 analyst meeting, Scolnick revealed Merck's drug pipeline, which included an announcement that Merck would begin filing applications worldwide in late 1998 for approval of a COX-2 inhibitor for inflammatory diseases, including osteoarthritis.

37. Meanwhile, Merck's secret concerns about the cardiotoxic potential of Vioxx led a senior Merck epidemiologist, in or about early 1998, to conduct an analysis of serious heart problems with Vioxx compared to placebo patients enrolled in studies of other Merck drugs.  This analysis revealed that, in women, Vioxx more than doubled the cardiovascular risk in a statistically significant manner compared

to people not taking any drug in other Merck studies. Merck neither made these data public nor followed up on their potential implications for the drug's cardiovascular safety.

38. Concerns about the drug's potential cardiovascular toxicity ran so high that, in or about 1998, Merck initiated an "adjudication" protocol to be used in all future clinical trials of Vioxx designed to determine whether reported adverse events qualified as adverse *cardiovascular* events by meeting a prespecified definition for potential thrombotic cardiovascular experiences.

39. In addition, data from a 1998 unpublished Merck clinical trial called "Study 090" found that serious cardiovascular events occurred approximately six times more often in patients taking Vioxx than in those taking other arthritis drugs or a placebo.

40. By 1998 Merck's base business was eroding, and the company was experiencing declining sales in key franchises. Merck was also encountering serious difficulties in the development of its new drug for depression, MK-869. Eventually, in or about January 1999, Merck announced that it would not begin Phase III trials for MK-869.

41. In Merck's 1998 Annual Report, Dr. Beth Seidenberg ("**Seidenberg**"), Vice President, Clinical Research, stated: "Everybody involved [in the Vioxx project] knew how extraordinarily important Vioxx is to patients with osteoarthritis and to Merck."

42. During this period, Scolnick impressed upon company employees the critical importance that Vioxx secure quick FDA approval.

43. Merck faced a significant competitive threat from Monsanto and Pfizer, two other pharmaceutical companies that together were developing another COX-2 inhibitor, Celebrex. In the late stages of the Vioxx development program, Scolnick became disturbed that Celebrex could reach the marketplace first. If it could not quickly bring Vioxx to market, Merck stood to lose billions of dollars in sales, to say nothing of the market niche it hoped to create for the drug.

44. On or about November 23, 1998, Merck filed its long-awaited New Drug Application ("NDA") with the FDA (NDA 21-042) to sell Vioxx 12.5 mg and 25 mg tablets to treat the signs and

symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. Data to support this NDA were included in IND 46,894.

45. In response to this application, an independent drug industry analyst noted that "Vioxx is very critical for Merck," and that "[e]verything depends on how well this product does."

46. On or about December 31, 1998, while the Vioxx NDA was still pending, the FDA approved the Celebrex NDA, permitting Celebrex to become the first selective COX-2 inhibitor marketed in the United States.

47. On or about January 6, 1999, Merck started an 8,000-patient, 12-month trial named the Vioxx Gastrointestinal Outcomes Research (hereafter "VIGOR") study to try to demonstrate the drug's gastrointestinal safety benefits.  The trial compared rheumatoid arthritis patients taking a high dose (50 mg) of Vioxx with those taking another pain reliever, naproxen (marketed over-the-counter as Aleve).

48. Critical to Merck's marketing plan for Vioxx was the ability to claim that Vioxx was just as effective as, but safer for the gastrointestinal tract than, traditional NSAIDs and Celebrex.  Merck commissioned the VIGOR study, not to study the cardiovascular toxicity of Vioxx, but rather in the hope of generating favorable data on the gastrointestinal toxicity of Vioxx to distinguish it from all other NSAIDs.  Such a distinction would allow Merck to snatch market share from Searle/Pfizer, which had beaten Merck to market with their own COX-2-inhibitor, Celebrex.

49. In designing the VIGOR study, Merck researchers faced a dilemma:  to lessen the risk of Vioxx-induced cardiovascular toxicity, trial patients likely required prophylactic, low-dose aspirin. However, aspirin use during the trial could undo any purported gastrointestinal safety advantage Vioxx might confer.

50. To minimize the potential for the VIGOR study to implicate Vioxx in heightened cardiovascular risk, Merck excluded "high" cardiovascular risk patients from the trial.  Merck hoped that it would thereby decrease the cardiovascular event rate and, as a consequence, obscure any differences in safety risks between the Vioxx and naproxen control groups.

51. In April 1999, more than four months after the FDA approved Celebrex for marketing, the FDA's Arthritis Advisory Committee met to advise the FDA on whether Vioxx should be approved for marketing. Industry analysts observed at this time that "[i]t will be very, very difficult" for Vioxx to penetrate the market, noting that "[t]o be able to displace Celebrex, [Vioxx] needs to have some significant superiority in its product label, such as a clearly enhanced safety profile . . . And it doesn't look like it will get it."

52. Merck failed to gain a clearly enhanced safety profile over Celebrex and other pain relievers on the market. Because Merck failed to conduct any study prior to approval demonstrating that Vioxx reduced the incidence of clinically meaningful gastrointestinal side effects typical of NSAID therapy, the FDA determined that Vioxx had not been proven safe enough to be sold without the warnings of gastrointestinal problems that Celebrex and other pain relievers carry.

53. Despite all the preclinical and clinical data generated on the potential cardiovascular hazards of Vioxx and repeated expressions of concern from its own researchers as well as its consultants, Merck told FDA's Arthritis Advisory Committee (AAC) in a backgrounder prepared for its April 20, 1999, meeting on Vioxx that "there is no evidence, preclinically or clinically, to suggest that rofecoxib [Vioxx] carries any increased risk for cardiovascular events."

54. One month later, on or about May 20, 1999, the FDA approved Vioxx for the relief of the signs and symptoms of acute pain, dysmenorrhea and osteoarthritis.

55. When studies on Vioxx and the competing drug, Celebrex, became available in 1998, many doctors were disappointed. Neither drug alleviated pain any better than the older medicines and the drugs cost close to $3 a pill. In contrast, over-the-counter pain relievers cost pennies a dose.

56. Even without FDA approval for labeling that allowed it to legitimately claim superiority, Merck did just that with the medical community and health care providers. For example, on or about November 1, 1999, Merck issued two press releases, entitled "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX," and "VIOXX v. Celebrex Poem." On or about December 16, 1999, the FDA advised Merck that these statements were false and misleading, in that they misrepresented the

drug's "safety profile," made "unsubstantiated comparative claims," and were "lacking in fair balance." Specifically, the FDA concluded that Merck misrepresented (1) the drug's "safety profile" by claiming that it was "safer than a placebo" and (2) the drug's efficacy through "unsubstantiated" comparisons to the COX-2 inhibitor, Celebrex and other NSAIDs.

57.  Thereafter, Merck persisted in misrepresenting the safety profile of Vioxx by concealing and minimizing the significantly increased risk of cardiovascular toxicity attendant upon the drug's use.

58.  On or about January 26, 2000, Merck issued a press release announcing its fourth quarter 1999 and full-year 2000 financial results.  Gilmartin was quoted as saying:  "Sales growth for the quarter and year was led by the established major products, the newer products, including VIOXX, as well as growth from the Merck-Medco Managed Care business.  VIOXX is the fastest growing prescription arthritis and pain medicine in the United States and represents one of the most successful product introductions in the pharmaceutical industry's history."

59.  Despite its best efforts to pre-ordain a clean cardiovascular bill of health, the VIGOR study results Merck finally received in or about early March 2000 devastatingly reinforced cardiovascular safety concerns its employees and consultants had repeatedly voiced for several years.  The trial revealed, among other things, that, notwithstanding that patients at high cardiovascular risk were not allowed entry into the trial, Vioxx users were five times more likely to suffer heart attacks than those taking naproxen. In addition, patients taking VIOXX were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) than naproxen patients.

60.  Upon receiving the VIGOR study results on or about March 9, 2000, Scolnick concluded that the "CV [cardiovascular] events are clearly there" and stated that Vioxx's cardiovascular toxicity is "mechanism based as we worried it was" and as some of the company's consultants, based on the Protocol 023 study, had maintained.

61.  "We were stunned" by the VIGOR findings, Dr. Alise S. Reicin ("**Reicin**"), the Merck researcher who ran the VIGOR study, later admitted.  "It's fair to say that we were all concerned."

62. Within weeks—for example, in a March 27, 2000, press release—Merck, determined to protect the image and marketability of its new blockbuster, seized upon and thereafter widely and continuously disseminated the post hoc rationalization that the VIGOR study only showed that naproxen reduced cardiovascular risk (i.e., it exerted "cardioprotective effects"), not that Vioxx posed a serious cardiovascular hazard.

63. Merck propagated its "naproxen theory" in Merck-authored or sponsored articles in medical journals, press releases and news reports, and lectures by prominent members of the medical community whom it financially supported.  For example, this theory was again advanced in an article on VIGOR that downplayed the incidence and severity of cardiovascular risks associated with Vioxx, while principally touting the favorable gastrointestinal safety results from the study that was published by Merck researchers and others, on November 23, 2000, in *The New England Journal of Medicine* ("NEJM"). The integrity and validity of this article would later be challenged by the NEJM's Editors in a published "Expression of Concern" in December, 2005 after they learned that relevant data on cardiovascular events had been deleted from the manuscript for this article prior to its submission to the journal and that study authors had also concealed that some trial participants who had heart attacks during the study were not reflected in the article.

64. At the same time that Merck publicly espoused its "naproxen theory," it internally acknowledged its lack of evidentiary support.  Merck realized that the magnitude of the anti-platelet or cardioprotective effect it ascribed to naproxen in the VIGOR study exceeded that of aspirin, the well-known anti-platelet agent, and that no prospectively defined cardiovascular outcomes study demonstrated that naproxen could confer such a benefit.  In fact, no randomized clinical studies had even been undertaken to evaluate whether naproxen was cardioprotective.

65. Merck continued to publish and publicly insist that naproxen was cardioprotective, even after Italian pharmacologist Carlo Patrono, one of Merck's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs, advised Merck in or about March 2000, that the dramatic cardiovascular effects observed in the VIGOR study could not be attributed to naproxen.

66. Merck also knew that FDA reviewers did not find its "naproxen theory" persuasive for a number of reasons, including the absence of support of naproxen's purported anti-platelet effects from prospective placebo-controlled trials and the implausibility of assigning more cardioprotective effect to naproxen than aspirin. In fact, as one consulting expert from FDA's Division of Cardio-Renal Drug Products noted, VIGOR may actually have established naproxen as the "preferred drug compared to [Vioxx]."

67. Merck further maintained that most of the adverse cardiovascular events in VIGOR occurred in patients who would have been on aspirin for cardioprotection had its use been allowed in the study. Merck knew, however, as the FDA had observed, that Vioxx also placed patients who did not fall into its "aspirin-indicated" subgroup at a statistically significant increased risk of developing serious cardiovascular events.

68. Merck's stock price initially dropped when the investing public became aware of the VIGOR results. In response, Merck publicly maintained that although Vioxx was perfectly safe, patients at risk of heart disease might consider taking low-dose aspirin while taking Vioxx. As the *Wall Street Journal* noted, however, such a step would raise their risk of ulcers—the side-effect Vioxx was designed to prevent.

69. Merck continued to float its "naproxen theory" notwithstanding that subsequently generated study data only reinforced the cardiovascular hazards of Vioxx and discredited it. For example, in March 2000, the month it received results from VIGOR, Merck also completed another comparative study of Vioxx and naproxen known as the ADVANTAGE study. Consistent with VIGOR, in ADVANTAGE an excess in serious cardiac thrombotic events occurred in the Vioxx group compared to the naproxen group, with twice the number of Vioxx patients discontinuing use due to adverse cardiovascular events. This was of particular concern to the FDA's medical reviewer, because ADVANTAGE was merely a 12-week study; the Vioxx dose of 25 mg/day was only half of that used in VIGOR (while the naproxen dose was identical in the two studies); the patients in ADVANTAGE suffered from osteoarthritis, a condition not predisposing to cardiovascular disease and injury to the same degree as rheumatoid arthritis, the condition

featured in VIGOR; and patients in ADVANTAGE, unlike those in VIGOR, were permitted to use aspirin if recommended to prevent heart disease.

70. During ADVANTAGE, eight patients taking Vioxx suffered heart attacks or sudden cardiac death, compared to just one taking naproxen, according to the assessments of the FDA. This difference was statistically significant, but Merck never disclosed the data this way.

71. The published results of the ADVANTAGE study only reported that five, not eight, Vioxx patients, had suffered heart attacks during the trial, compared with one taking naproxen, a difference that was not statistically significant. Dr. Jeffrey R. Lisse, a University of Arizona rheumatologist, who was listed as the study's first author, has stated that Merck, which "designed the trial, paid for the trial, ran the trial" actually wrote the published report of it. "Basically, I went with the cardiovascular data that was presented to me," he said. Harold Sox, editor for the *Annals of Internal Medicine*, which published that report, has stated that "[i]f they had told us it was 8-to-1, it would have been much different than 5-to-1."

72. Arguing that the results of VIGOR merely signaled Vioxx's lack of anti-platelet activity, Merck publicly suggested the use of low-dose aspirin in high risk patients to prevent cardiovascular thrombotic events. Merck knew from ADVANTAGE, however, that concomitant aspirin use would not afford such protection, as the incidence of such events remained substantially higher among Vioxx patients additionally taking low-dose aspirin than naproxen patients also on low-dose aspirin. Given the established anti-platelet properties of aspirin, this also suggested that the excess cardiovascular risk confronting the Vioxx patients in VIGOR could not be explained by the antiplatelet effects of naproxen, as Merck had insisted.

73. Merck also knew from ADVANTAGE that concomitant use of low-dose aspirin could eliminate any gastrointestinal safety advantage of Vioxx over naproxen, as such use in the trial increased the risk of serious gastrointestinal events among the Vioxx population while leaving that risk essentially unchanged in the naproxen arm. In addition, Merck learned from its 12-week endoscopy study, Protocol 136, that the cumulative incidence of gastroduodenal ulcers in patients who concurrently took Vioxx with low-dose aspirin was substantially higher than in patients who took low-dose aspirin or placebo.

13

74. As was ultimately revealed, while reviewing the results of ADVANTAGE, amid rising concerns that its painkiller Vioxx posed heart risks, Merck even overruled one of its own scientists after he suggested that a patient in a clinical trial had probably died of a heart attack. A senior Merck scientist repeatedly urged the researcher to change his findings about the death "so that we don't raise concerns."

75. The discussion of the death and its implications is contained in several Merck records, including e-mail messages from Scolnick and from Dr. Alise S. Reicin, a vice president for clinical research, that indicate Merck's knowledge of data contradicting its public statements that Vioxx was safe. In one e-mail message, Scolnick said the drug trial that included the woman's death had "put us in a terrible situation." In others, Scolnick fiercely criticized the FDA and said he would personally pressure senior officials at the agency if it took action unfavorable to Vioxx. In still another email message from Scolnick to Dr. Douglas Greene, an Executive Vice President at Merck Research Laboratories, Scolnick wrote that he was especially angry because the ADVANTAGE trial had no scientific purpose. In theory, Merck set up the trial to show that Vioxx caused fewer stomach problems than naproxen. But Merck had already demonstrated that with the VIGOR trial. "This course is just stupid," Scolnick wrote. "Small marketing studies which are intellectually redundant are extremely dangerous." Scolnick also expressed his concern in e-mail messages to other senior Merck scientists that the ADVANTAGE results would encourage the FDA to demand that Vioxx's label highlight its cardiac risks. Such a change would have damaged Vioxx's sales, especially because a competing drug, Celebrex, did not have heart risks prominently displayed on its warning label.

76. During the month of May 2000, Merck's top research and marketing executives met to consider whether to develop a study to directly test a disturbing possibility: that Vioxx might pose a heart risk in light of the results from its other clinical trials that suggested such concerns.

77. The Merck executives rejected pursuing a study focused on Vioxx's cardiovascular risks. Merck's marketers feared it could send the wrong signal about the company's confidence in Vioxx, which already faced fierce competition from a rival drug, Celebrex. "At present, there is no compelling

marketing need for such a study,'" said a slide prepared for the meeting. "Data would not be available during the critical period. The implied message is not favorable."

78. On or about June 29, 2000, Merck submitted the results of the VIGOR trial, which evidenced that Vioxx significantly reduced the risk of developing gastrointestinal complications compared to naproxen, in support of a request for revised labeling to reflect Vioxx's purportedly favorable gastrointestinal safety profile.

79. In mid-2000, Merck also submitted data from Studies 085 and 090 -- two relatively small, six-week, studies comparing osteoarthritis patients taking Vioxx, nabumetone or placebo -- to the FDA. Despite the small sample size, the use of the lowest FDA-approved dose for Vioxx (12.5 mg/day), and permitted use of aspirin, the trend for adverse cardiovascular events was against Vioxx, with more Vioxx patients experiencing heart attacks and discontinuing due to adverse cardiovascular experiences than in the nabumetone or placebo groups. In fact, notwithstanding its small size, in Study 090, it was later revealed that there was a statistically significant increased incidence of heart attacks and strokes in the Vioxx group relative to a placebo.

80. Dr. Peter Juni and colleagues published a cumulative meta-analysis of randomized clinical trials of Vioxx in *The Lancet* in December 2004 in which they demonstrated that "an increased risk of myocardial infarction was evident from 2000 onwards" and that "[a]t the end of 2000, the effect was both substantial and unlikely to be a chance finding." An increased risk of heart attacks surfaced in trials of both short and long duration, and they found no evidence that the drug's cardiovascular toxicity was dose-dependent. The authors concluded that Vioxx should have been removed from the market "as early as 2000 because studies of the drug had clearly shown that it doubled the risk of heart attacks among users."

81. According to Dr. Eric Topol, the Cleveland Clinic's chairman of cardiovascular medicine, when the unpublished results of Merck's unpublished "090" study was combined with Merck's VIGOR study, it showed that Merck had evidence by 2000 that Vioxx was not safe. Topol said that when he tried to express his concerns about Vioxx to top Merck officials, including Gilmartin, they refused to take his call.

82. By at least 2000, Merck was internally attempting to cure the problems with Vioxx that it refused to publicly acknowledge.    According to a 2000 Merck internal document entitled "Confidential Memorandum of Invention," Merck discussed and pursued a patent to try to reduce heart-attack risks for users of Vioxx while continuing to publicly deny that Vioxx could cause heart attacks.  Merck officials stated in that document that the way in which Vioxx reduces pain might also increase cardiovascular problems; specifically, they noted that Vioxx might reduce the production of a substance that prevents platelet aggregation or clotting called prostacyclin, thereby increasing the risk of cardiac and cerebral adverse events.  They raised the idea of seeking a patent for a method of combining Vioxx with another agent to lessen the risk.  The patent application, dated May 14, 2001, and obtained from the U.S. Patent and Trademark Office, lists its top inventor as Scolnick.  Scolnick also was involved in writing the confidential internal memo.

83. While the conclusion that Vioxx carried a significant cardiovascular risk was obvious to Merck, it was not obvious to the medical and financial communities. Both health care decision makers (e.g.- doctors, formularies) and the stock market accepted Merck's representation that Vioxx was safe despite the results of VIGOR. This translated into prescriptions and corresponding sales revenues. Consequently, between June 30, 2000, and December 2000, Merck's stock price rose 19 percent, and second and third quarter profits exceeded analysts' estimates, helped by increasing sales of Vioxx. Scolnick and Merck Chief Financial Officer Judy Lewent assured the financial community that Merck could repeat that kind of performance in the future.

84. Merck enjoyed $2.2 billion in Vioxx sales for the year 2000.  Its launch was the industry's second-best ever.

85. As analysts recognized, the success of Vioxx continued to be critical to Merck.  The patents on several popular Merck drugs expired in 2000 and 2001, opening them to generic competition.  As one drug industry analyst noted: "Vioxx was Merck's savior, it's as simple as that."

86. In February 2001, FDA's Arthritis Advisory Committee met to consider the gastrointestinal benefits and cardiovascular safety of Vioxx.  In briefing materials prepared for that meeting, the FDA's

staff, noting an increased risk of developing cardiovascular thrombotic events in VIGOR, recommended that information regarding such events be added to the Vioxx label.  Merck countered that aggregate data from the Vioxx development program "supports the cardiovascular safety" of Vioxx and that the VIGOR study results "are most consistent with naproxen having provided a cardioprotective benefit to patients at risk for these events."

87.  In response to news and analyst reports of data from VIGOR, Merck issued a press release on May 22, 2001, reconfirming the favorable cardiovascular safety profile of Vioxx.

88.  Despite the May 2001 press release, Merck Chief Financial Officer Lewent knew by at least June 2001 that Merck would never meet analysts' forecasts for 2001 profits, and that results for 2002 would be grim as well.  On June 22, 2001, Merck issued a statement that 2001 earnings would grow no faster than 10% instead of the 12% expected.  The stock fell 9% in a day.

89.  Merck learned in August 2001 that *The Journal of the American Medical Association* (*JAMA*) intended to run an article by prominent researchers from the Cleveland Clinic that raised concern about the serious cardiovascular risks of COX-2 inhibitors like Vioxx.

90.  One day before, and in anticipation of publication of, the *JAMA* article, Laura Demopoulos, Merck's Senior Director of Cardiovascular Clinical Research, issued a preemptive press release:  "We have additional data beyond what they cite, and the findings are very, very reassuring.  Vioxx does not result in any increase in cardiovascular events compared to placebo."

91.  Merck attempted, but ultimately failed, to persuade *JAMA* and the study's authors to withdraw or change the article (following face-to-face meetings with all concerned).  On or about August 22, 2001, cardiologists Deborah Mukherjee, M.D., Eric J. Topol, M.D., and Steven E. Nessen, M.D., of the Cleveland Clinic Foundation reported in *JAMA* that the Cleveland Clinic had evaluated four randomized trials concerning selective COX-2 inhibitors involving more than 16,000 patients.  Among other things, they reported that the annualized myocardial infarction rate for Vioxx patients in VIGOR was significantly higher than in the placebo group of a recent meta-analysis of patients in primary prevention trials.  They concluded:  "Given the remarkable exposure and popularity of this new class of

medications, we believe that it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents. Until then, we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity."

92. On or about August 23, 2001, the day after the *JAMA* article was published, Merck issued another press release, stating: "The Company stands behind the overall and cardiovascular safety profile of Vioxx." It also sent "Dear Doctor" letters to physicians around the county, via Federal Express, attempting to denigrate the study's findings.

93. Merck's attempt to attribute all of the negative results of VIGOR to the purportedly cardioprotective properties of naproxen earned a rebuke from the FDA. On or about September 17, 2001, the FDA issued a formal warning to Gilmartin regarding Merck's "promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings" that were observed in the VIGOR trial. The FDA specifically objected to Merck's dissemination of the "naproxen theory", noting that Merck failed to disclose that it was "hypothetical, ha[d] not been demonstrated by substantial evidence, and that there [was] another reasonable explanation, that Vioxx may have pro-thrombotic properties." Identifying statements made in Merck audio conferences and by sales representatives directed toward physicians, the FDA found the misrepresentations so extreme as to constitute "significant public health and safety concerns." Addressing Merck's public "reconfirm[ation]" of the cardiovascular safety of Vioxx in its May 22, 2001, press release, the FDA warned Merck that "your claim . . . that Vioxx has a 'favorable cardiovascular profile' is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen." Additionally, the FDA reproached Merck for improperly comparing VIGOR and the Celebrex study known as CLASS (Celebrex Long-Term Arthritis Safety Study) to misrepresent that Vioxx was more effective and safer than Celebrex.

94. Even after receiving this letter, and despite Merck's knowledge of the serious adverse cardiovascular risks of Vioxx, Merck continued to misrepresent the safety of the drug in its public statements. Merck denied reports concerning the increased risk of cardiovascular problems as inaccurate and inconclusive.

95. Rather than disclose the truth, Merck made numerous statements designed to paint a positive picture about itself and Vioxx. While Merck knew of the cardiovascular risks posed by Vioxx, it continued its deceptive promotional campaign to falsely minimize the risks and dangers associated with the drug. Merck issued a number of press releases regarding Vioxx, which were misleading in that they did not include the whole truth regarding its serious dangers.

96. On or about October 15, 2001, the FDA asked Merck to revise Vioxx's labeling to warn physicians that Vioxx could cause heart attacks and other cardiovascular problems. The FDA proposed that the warning state the following:

Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure.

The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with Vioxx 50 mg (0.5%) as compared to patients treated with naproxen (0.1%) . . . . this finding was consistent in a smaller and shorter study using Vioxx 25 mg that allowed the use of low dose ASA [aspirin]. Prospective, well powered, long-term studies required to compare the incidence of serious CV events in patients taking Vioxx versus NSAID comparators other than naproxen have not been performed.

97. Concerned that a cardiovascular warning for Vioxx would adversely affect sales and that, in the COX-2 inhibitor market, the company with the better label would sell more drugs, Merck engaged in protracted negotiations with the FDA over labeling from October 2001 until April 2002 in large measure because it refused to accept the FDA's request that a discussion concerning cardiovascular toxicity potential be included in the "Warnings" section of the Vioxx labeling. Under the Food, Drug and Cosmetic Act, the FDA lacks authority to require specific labeling changes and, therefore, must negotiate with manufacturers to revise labeling. For approximately six months, Merck resisted several of the FDA's proposals, leading to a series of conference calls to negotiate differences and extensive delay.

98. Acknowledging analyst concerns about Merck's future, Scolnick told *The Wall Street Journal* on December 7, 2001: "The company is not blind to the fact that . . . people are questioning whether we are fundamentally still sound." However, Scolnick sought to reassure the market, stating that "the smartest people in the company have concluded that we're actually in good shape." Scolnick's answer to

19

analyst concerns was to produce new drugs, such as the COX-2 inhibitor Arcoxia (etoricoxib) within the following year—a purportedly improved version of Vioxx. In so doing, Scolnick hoped to reassure analysts that Merck's recent travails are "simply a bump in the road."

99. Nevertheless, four days later, on December 11, 2001, Merck reduced its estimate of Vioxx 2001 sales to about $2.6 billion from a high of $3.5 billion as concerns grew about the drug. Gilmartin explained that Vioxx sales fell short of estimates this year, pushing profit below forecasts, because of concerns that Vioxx might increase the risk of heart attack in some patients. Dr. Scolnick elaborated that Merck would conduct more research on Vioxx and Arcoxia so that it could be "100 percent sure" of the medicines' safety. Scolnick concluded: "Whatever the answer is in these studies, we will report it to the world."

100. Merck was poised to begin a cardiovascular outcomes study in patients with acute coronary syndrome in March 2002, but abruptly dropped the project just before it was set to start. It was never revived.

101. Work on this cardiovascular outcomes trial was halted at the same time that officials from Merck and the FDA were concluding lengthy and heated negotiations over how Vioxx's label would reflect data from VIGOR, which indicated that Vioxx posed potential cardiovascular risks.

102. In a double-edged move for Merck, on April 12, 2002, the Vioxx labeling was revised to state that the drug seemed to protect against ulcers but also added some language suggesting that it might increase the risk of heart attacks. Although this revised labeling contained language concerning the cardiovascular risks of Vioxx, Merck downplayed the significance of those risks, stating, *inter alia*, that the "significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown."

103. The evidence regarding the cardiovascular effect of Vioxx continued to mount. On or about October 5, 2002, an observational study by Dr. Wayne Ray and colleagues concerning Vioxx and other NSAIDs used in a Tennessee Medicaid population published in *The Lancet* concluded that Vioxx at

doses in excess of 25 mg/day significantly increased the risk of serious coronary heart disease; in contrast, there was no evidence of increased risk among users of Celebrex, naproxen or ibuprofen.

104.    Likewise, in or about October 2003, researchers from Harvard University-affiliated Brigham & Women's Hospital presenting a Merck-funded study at the American College of Rheumatology meeting in Orlando, Florida, reported an increased risk of acute myocardial infarction in patients taking Vioxx compared with those taking Celebrex, particularly in the first 90 days.  Based on dose-specific comparisons between the two drugs, the adjusted relative risk of heart attack associated with Vioxx increased in a dose-related manner.  This study was eventually published in May 2004 in *Circulation*.

105.    Merck discounted the findings of the Brigham & Women's study.  "Randomized clinical trials are the gold standard" and this is not such a trial, said Alise Reicin, Merck's executive director of clinical research.  "In our placebo-controlled randomized trials, we have found no significant difference between Vioxx and placebo."

106.    It was later reported that in addition to sponsoring the Brigham & Women's study, Merck's epidemiologist Carolyn Cannuscio was originally the lead author of this study and participated actively in the study design, statistical analysis, and interpretation of the data.  Seeking to distance itself from the study's findings, however, Merck ordered her name purged from the list of authors.

107.    In an article appearing in the *Archives of Internal Medicine* in January 2005, Daniel Solomon and Jerry Avorn, who authored the Brigham and Women's Hospital study, observed that "even after funding and agreeing with the design of the Study, Merck publicly discredited our findings."

108.    In or about November 2003, Merck received preliminary results of a study it had commissioned performed by Merck personnel and Alex Walker, an executive at the Ingenix unit of United Health Group.  The study revealed a statistically significantly greater incidence of myocardial infarction or unstable angina pectoris associated with use of Vioxx compared to the NSAIDs ibuprofen or diclofenac.  The risk did not vary significantly by duration, use, or dose.  By contrast, the risk of

myocardial infarction or unstable angina was not significantly greater with Celebrex than with ibuprofen or diclofenac.

109.    In or about March 2004 a population-based analysis by Whelton, et al. presented at the American College of Cardiology meeting concluded that Vioxx significantly increased the risk of heart attack or stroke compared with non-users of NSAIDs (RR 2.45, 95% CI 1.71, 3.51); no increased risk was reported among users of Celebrex or non-selective NSAIDs.

110.    On or about August 11, 2004, Dr. David Graham in FDA's Office of Drug Safety, together with Dr. Wayne Ray and other co-authors, presented a FDA-funded observational study at an international epidemiology conference in France, which compared the rate of cardiovascular events in patients taking Vioxx, Celebrex, and non-selective NSAIDs.  Based on Kaiser Permanente claims data, the study concluded that heart attack rates tripled for patients taking Vioxx in doses higher than 25 mg/day.

111.    On or about August 26, 2004, Peter Kim, President of Merck Research Laboratories, issued a press release stating:  "Merck strongly disagrees with the conclusions of an observational analysis by Graham et al, presented at an international medical meeting this week . . .  Merck stands behind the efficacy and safety, including cardiovascular safety, of VIOXX."

### 4.  Merck's Decision to Withdraw Vioxx

112.    On or about September 23, 2004, an aide to Merck's Dr. Peter Kim ("**Kim**")received a call informing him that an outside panel overseeing a placebo-controlled clinical trial of Vioxx urged Merck to halt the trial and take patients off the drug because of trial findings implicating Vioxx in a significantly increased cardiovascular risk.

113.    This clinical study, known as the Adenomatous Polyp Prevention on Vioxx ("APPROVe") trial, was started in February 2000 and was intended to evaluate the effectiveness of 25 mg/day of Vioxx in preventing colon polyps.

114.     On or about September 17, 2004, the External Safety Monitoring Board ("ESMB") for the APPROVe trial noted that "the trend for excess risk" for heart attacks and strokes "has continued to grow at each meeting over the last 1-2 years."  Consequently, the ESMB recommended that participating patients in APPROVe be instructed to discontinue the study treatment.  Merck abruptly discontinued the APPROVe study in mid-September 2004.

115.     William G. Bowen, a Merck director since 1986, said management met all day on September 27, 2004 "to decide what they thought they should do" about the results of APPROVe.  Merck directors subsequently arrived on September 28, 2004, for a regularly scheduled board meeting at the company's New Jersey headquarters.  Over a three-and-a-half-hour lunch session, Gilmartin and Dr. Kim presented the research findings.  The Directors spent nearly 40 minutes discussing the study's statistical significance.  But "the results were compelling," Mr. Bowen said.  Everyone in the boardroom agreed that Merck should withdraw the drug.

116.     On or about September 27, 2004, Merck advised the FDA that the ESMB recommended discontinuation of the APPROVe study.  The following day, Merck informed the FDA that it was withdrawing Vioxx from the market.

117.     On or about September 30, 2004, Merck publicly disclosed the outcome of the APPROVe study and announced that it was withdrawing Vioxx from the market because APPROVe had implicated Vioxx in a statistically significant increased risk of confirmed cardiovascular events—principally heart attacks and strokes—in patients taking Vioxx compared to those ingesting a placebo.

118.     The APPROVe study demonstrated that Vioxx doubled the risk of heart attack and stroke for patients who had taken the drug for a period in excess of 18 months, as compared to subjects taking a placebo for the same period of time.

119.     In APPROVe, the relative risk for adverse cardiovascular events for Vioxx patients already at heightened cardiovascular risk was particularly high.  For example, VIOXX patients with a history of symptomatic atherosclerotic cardiovascular disease were approximately 9 ½ times more likely

to suffer such events than their placebo counterparts and those with a history of diabetes were approximately 6 times as likely to experience such events as patients in the placebo arm.

120.     Upon the announcement of the market withdrawal of Vioxx, that which Merck feared and sought to avoid by its conduct in misrepresenting or concealing the danger Vioxx posed occurred.  Merck stock plunged 27 percent, to $33 on very heavy trading.  The closing price was the lowest since $32.95 on Feb. 15, 1996—the same year that Merck first wrestled with the prospect of Vioxx's likely cardiovascular effects.  The percentage decline was Merck's largest in at least 20 years and the stock was the most active in U.S. trading that day.

121.     Standard & Poor's Ratings Service downgraded its outlook on Merck's corporate rating from stable to negative.  Moody's Investors Service warned that it might cut ratings on Merck's senior unsecured debt, an action that would affect $4.9 billion in borrowings.

122.     Vioxx was the biggest drug by sales ever withdrawn from the market.  Immediately after the September 30th announcement, Merck's drop in share price by 27 percent erased about $26.8 billion in market value for the company.  As of November 1, 2004, the stock had fallen almost 13 percent more, and was down 39 percent for the year.

## B.  BEXTRA

123.     Bextra (valdecoxib) was developed in the late 1990s by the G.D Searle & Co. division of Pfizer Pharmaceuticals and was approved by the Food and Drug Administration on November 16, 2001. Bextra, like Vioxx, is a COX-2 Selective Inhibitor.  Bextra quickly became one of the largest sales volume COX-2 Inhibitors on the market, recording sales in the tens of billions of dollars.

124.     G.D. Searle was founded in Omaha, Nebraska in 1888.  In 1908, the company was incorporated in Chicago. It was acquired by the Monsanto company in 1985. Pharmacia Corporation was created in April 2000 through the merger of Pharmacia & Upjohn (itself the result of the merger of Pharmacia and Upjohn) with the Monsanto Company and its G.D. Searle unit. The merged company is based in  Peapack, New Jersey.  Pfizer acquired Pharmacia in 2003 and retired the Searle name.

125.    Pfizer bought competitor Pharmacia to become the largest pharmaceutical company in the world. The merger was again driven in part by the desire to acquire full rights to the blockbuster product, Celebrex (celecoxib), the COX-2 selective inhibitor previously jointly marketed by Searle (acquired by Pharmacia) and Pfizer.

126.    In response to the numerous studies indicating an unsafe, increased risk of injury associated with Bextra, Pfizer insisted that in its own reviews of various studies, that there was no increase in risk and/or that the studies were not statistically significant.

127.    In October, 2004, Pfizer first disclosed that high-risk heart patients taking Bextra were at an elevated risk of suffering significant cardiovascular problems.

128.    On November 10, 2004, the New York Times reported preliminary results of a study presented the day before at the American Heart Association meeting in New Orleans. The study, which pooled data from 5,930 patients taking part in 12 trials, found 2.19 times the number of heart attacks or strokes among patients given Bextra, compared with those given placebos. Merck had recently withdrawn Vioxx, a drug similar to Bextra, after a longer and better-controlled study showed that it doubled the risk of heart attack and stroke. "The magnitude of the signal with Bextra is even higher than what we saw in Vioxx," Dr. Garret A. FitzGerald, a cardiologist and pharmacologist at the University of Pennsylvania, said in an interview after presenting the data. "This is a time bomb waiting to go off."

129.    On December 9, 2004, the US Food and Drug Administration (FDA) announced a "black box" warning for Bextra (valdecoxib), stating that its use in patients undergoing coronary artery bypass grafting is contraindicated.

130.    On December 23, 2004, the FDA issued a Public Health Advisory summarizing the agency's recent recommendations concerning the use of the nonsteroidal anti-inflammatory drug products (NSAIDs) Vioxx, Bextra, Celebrex, and naproxen.  Quoting from the Public Health Advisory:

a.    "Physicians prescribing Celebrex (celecoxib) or Bextra (valdecoxib) should consider this emerging information when weighing the benefits against risks for individual patients. Patients who are at a high risk of gastrointestinal (GI) bleeding, have a history of intolerance to non-

selective NSAIDs, or are not doing well on non-selective NSAIDs may be appropriate candidates for COX-2 selective agents.

b.    Individual patient risk for cardiovascular events and other risks commonly associated with NSAIDs should be taken into account for each prescribing situation.

c.    Consumers are advised that all over-the-counter (OTC) pain medications, including NSAIDs, should be used in strict accordance with the label directions. If use of an OTC NSAID is needed for longer than ten days, a physician should be consulted."

131.    On January 17, 2005, the American Heart Association published results of a study that found some Pfizer patients were at a threefold risk of suffering a heart attack or stroke. The warning brought further attention to Bextra and the entire class of Cox-2 drugs whose safety has been called into question following the Vioxx recall.  This report corroborated the prior study reported on November 10, 2004 in the New York Times.

132.    After careful consideration of the significant increase in risk of heart attack, stroke and the occurrence of sometimes deadly allergic skin reactions, the FDA re-addressed the risk-versus-benefit determination used to measure the value of the drug.

133.    On April 7, 2005, upon the urging of the FDA, Pfizer suspended sales of Bextra.

134.    Defendants Pfizer and Pharmacia sold Bextra by misleading users about the product and by failing to adequately warn the public at large, including Plaintiff's Decedent Timothy E. Lichter, of the potential serious dangers which Defendants Pfizer and Pharmacia knew or should have known might result from consuming its product. Defendants Pfizer and Pharmacia widely and successfully marketed Bextra throughout the United States by, among other things, conducting promotional campaigns which misrepresented the efficacy of Bextra in order to induce widespread use and consumption.  Bextra was represented to safely aid in relieving the pain and discomfort of Arthritis, Osteoarthritis and related problems. Defendants Pfizer and Pharmacia made misrepresentations by means of media advertisements and statements contained in sales literature provided to Plaintiff's Decedent's, Timothy E. Lichter's prescribing physician.

135.     Defendants Pfizer and Pharmacia failed to perform adequate testing that would have shown Bextra caused serious side effects. Defendants Pfizer and Pharmacia also failed to provide warnings that would accurately reflect the serious side effects caused by Bextra.

136.     Prior to the manufacturing, sale, and distribution of Bextra, Defendants Pfizer and Pharmacia had notice and knowledge from several sources that Bextra presented substantial and unreasonable risks of harm to consumers.

137.     Despite knowledge of the serious risks Bextra posed to consumers, Defendants Pfizer and Pharmacia proceeded with the manufacturing, sale and marketing of Bextra. The conduct of the Defendants Pfizer and Pharmacia was therefore wanton and willful, and displayed a conscious disregard for Plaintiff's Decedent Timothy E. Lichter's safety, in particular, and the public in general.

138.     At the time the Plaintiff's Decedent, Timothy E. Lichter, was given Bextra, he was not warned or aware of the serious and debilitating health effects of taking Bextra because neither he nor his physician were warned or aware of such health effects.

139.     Defendants Pfizer and Pharmacia acted with conscious and wanton disregard of the health and safety of Timothy E. Lichter, in particular, and the public in general. The above-described wrongful conduct was done with knowledge, authorization and ratification of the officers, directors, managing agents and/or employees of Defendants Pfizer and Pharmacia.

## IV. CAUSES OF ACTION

### COUNT I
### PLAINTIFF V. DEFENDANT MERCK & CO., INC.
### STRICT PRODUCT LIABILITY CLAIM

140.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

141.     Defendant Merck was the researcher, developer, manufacturer, distributor, marketer, promoter, supplier and seller of Vioxx, which is defective and unreasonably dangerous to consumers.

142.    At all times material hereto Vioxx was not reasonably fit, suitable or safe for its intended purpose, and/or its foreseeable risks exceeded the benefits associated with its design and formulation.

143.    At all times material hereto Vioxx lacked efficacy and/or it posed a greater likelihood of injury than other nonsteroidal anti-inflammatory medicines and similar drugs on the market and was more dangerous than ordinary consumers could have reasonably foreseen.

144.    Vioxx was in an unreasonably dangerous condition at the time it left the hands of Defendant Merck. Vioxx was expected to and did reach consumers, including Plaintiff's Decedent, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

145.    Plaintiff's Decedent was unaware of the significant hazards and defects in Vioxx. Vioxx was unreasonably dangerous in that it was more dangerous than would be reasonably contemplated by the ordinary user. During the period that Plaintiff's Decedent was taking Vioxx, the medication was being utilized in a manner that was intended by Defendant Merck. At the time Plaintiff's Decedent received and consumed Vioxx, it was represented to be safe and free from latent defects.

146.    Defendant Merck is strictly liable to Plaintiff for designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of Defendant because of the design defects.

147.    Defendant Merck knew or should have known of the danger associated with the use of Vioxx, but continued to design, manufacture, sell, distribute, market, promote and/or supply Vioxx so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

148.    Defendant Merck researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, Vioxx, and in the course of same, directly advertised or marketed the product to the FDA, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Vioxx.

149.     Vioxx was under the exclusive control of the Defendant Merck as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side effects and complications associated with the use of Vioxx, dangerous drug-drug interactions and food-drug interactions, and the comparative severity, duration and the extent of the risk of injury with such use.

150.     Defendant Merck failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx so that no medical care provider would have prescribed, or no consumer would have used, Vioxx had those facts been made known to such providers and consumers.

151.     Defendant Merck violated its post-manufacture duty to warn.  The duty arose when Merck knew, or with reasonable care should have known, that Vioxx was injurious and sometimes fatal.

152.     Defendant Merck failed to perform or otherwise facilitate adequate testing in that such testing would have shown that Vioxx posed serious and potentially life-threatening side effects and complications.  Full and proper warning accurately and fully reflecting the symptoms, scope and severity should have been made to medical care providers, the FDA and the public, including the Plaintiff's Decedent.

153.     Vioxx, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Defendant, was defective due to inadequate post-marketing warnings and/or instruction.  After Defendant knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx, Defendant failed to provide adequate warnings to medical care providers, the FDA and the consuming public, including Plaintiff's Decedent, and continued to promote Vioxx aggressively.

154.     As a direct and proximate result of the conduct of Defendant Merck as aforesaid, Plaintiff's Decedent suffered serious physical and emotional injuries resulting in his death, suffered economic loss, and has otherwise been physically, emotionally and economically injured.

**WHEREFORE,** Plaintiff demands judgment against Defendant Merck for compensatory, statutory and/or punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT II
## PLAINTIFF V. DEFENDANT MERCK & CO., INC.
## NEGLIGENCE

155.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

156.    Defendant Merck owed a duty to Plaintiff to manufacture and sell Vioxx in a safe manner, free from defects.

157.    Defendant Merck was negligent in designing and manufacturing Vioxx and by failing to provide adequate warnings to consumers about the risks and dangers of using Vioxx.

158.    As a direct and proximate result of the conduct of Defendant Merck as aforesaid, Plaintiff's Decedent suffered serious physical and emotional injuries resulting in his death, suffered economic loss, and has otherwise been physically, emotionally and economically injured.

**WHEREFORE,** Plaintiff demands judgment against Defendant Merck for compensatory, statutory and/or punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III
## PLAINTIFF V. DEFENDANT MERCK & CO., INC.
## BREACH OF WARRANTY

159.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

160.    Defendant Merck placed Vioxx into the stream of commerce for sale and recommended its use to physicians, the FDA and consumers without adequately warning physicians, the FDA and consumers, including the Plaintiff's Decedent, of the risks associated with the use of Vioxx.

161.    Defendant Merck had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion, sale and release of Vioxx, including a duty to:

a.    Ensure that the product did not cause the user unreasonably dangerous side effects;

b.    Warn of dangerous and potentially fatal side effects; and

c.    Disclose adverse material facts when making representations to physicians, the FDA and the public at large, including Plaintiff's Decedent.

162.    When Plaintiff's Decedent's physician prescribed Vioxx and Plaintiff's Decedent  made the decision to use Vioxx, both Plaintiff's Decedent and his physician reasonably relied upon the Defendant and its agents to disclose known defects, risks, dangers and side effects of Vioxx.

163.    Plaintiff's Decedent's physician, the FDA and/or Plaintiff's Decedent had no knowledge of the falsity or incompleteness of the Defendant's statements and representations concerning Vioxx when Plaintiff's Decedent's physician prescribed and/or otherwise provided Vioxx and Plaintiff's Decedent purchased and used Vioxx as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by the Defendant. Plaintiff's Decedent justifiably and detrimentally relied on the warranties and representations of Defendant in the purchase and use of Vioxx.

164.    Defendant Merck was under a duty to disclose the defective and unsafe nature of Vioxx to physicians, the FDA, consumers and users, such as Plaintiff's Decedent. Defendant had sole access to material facts concerning the defects.   Defendant knew that physicians, the FDA and users, such as Plaintiff's Decedent, could not have reasonably discovered such defects.

165.    By the conduct alleged and by operation of law, Defendant Merck, its agents and employees extended various warranties to Plaintiff's Decedent and Plaintiff's Decedent's physician including without limitation, that Vioxx was merchantable, fit for the purpose intended and that it was designed and manufactured in accordance with good design and industry standards.

166.    Defendant Merck breached the above warranties in that Vioxx was not safe and effective

as a medication for arthritis and pain, as Defendant had represented, it was defective as set forth herein, and it was not designed, manufactured or sold in accordance with good design and industry standards.

167.    As a direct and proximate result of the conduct of Defendant Merck as aforesaid, Plaintiff's Decedent suffered serious physical and emotional injuries resulting in his death, suffered economic loss, and has otherwise been physically, emotionally and economically injured.

**WHEREFORE,** Plaintiff demands judgment against Defendant Merck for compensatory, statutory and/or punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT IV
## PLAINTIFF V. DEFENDANT MERCK & CO., INC.
## CONSUMER FRAUD

168.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

169.    Defendant Merck was the researcher, developer, designer, tester, manufacturer, inspector, labeler, distributor, marketer, promoter, seller and/or otherwise released Vioxx into the stream of commerce.

170.    Defendant Merck knew or should have known that the use of Vioxx causes serious and life threatening injuries but failed to warn the public, including Plaintiff's Decedent, of same.

171.    Defendant Merck made untrue, deceptive or misleading representations of material facts to and omitted and/or concealed material facts from Plaintiff's Decedent in product packaging, labeling, medical advertising, direct-to-consumer advertising, promotional campaigns and materials, among other ways, regarding the safety and use of Vioxx. Moreover, Defendant downplayed and/or understated the serious nature of the risks associated with Vioxx in order to increase the sales of Vioxx and secure a greater share of the COX-2 market.

172.    Defendant Merck's statements and omissions were undertaken with the intent that the FDA, physicians, and consumers, including the Plaintiff's Decedent, would rely on the Defendant's statements and/or omissions.

173.    Defendant Merck knew of the growing public acceptance of the misinformation and misrepresentations regarding the safety and efficacy of Vioxx but remained silent because Merck's appetite for significant future profits far outweighed its concern for the health and safety of the Plaintiff's Decedent.

174.    Plaintiff's Decedent's physician prescribed and/or otherwise provided Plaintiff's Decedent with Vioxx.  Plaintiff's Decedent consumed Vioxx for personal health reasons, and suffered ascertainable losses of money as a result of the Defendant's use or employment of the methods, acts, or practices alleged herein.

175.    The aforesaid promotion and release of Vioxx into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts with the intent that others would rely upon such concealment, suppression or omission in connection with the sale or advertisement of such merchandise or services by Defendant, in violation of New Jersey Consumer Fraud Act., N.J.S.A, 56:8-1 *et seq.* and/or other federal, state or local laws, regulations or common law that may be applicable concerning consumer fraud, deceptive trade practices, misrepresentation or similar matters.

176.    Defendant Merck concealed, omitted, or minimized the side effects of Vioxx, or provided misinformation about adverse reactions, risks and potential harms from Vioxx.  Defendant Merck succeeded in persuading consumers to purchase and ingest Vioxx despite the lack of safety and the risk of adverse medical reactions, including cardiovascular events and gastrointestinal effects.

177.    Defendant Merck's practice of promoting and marketing Vioxx created and reinforced a false impression as to the safety of Vioxx, thereby placing consumers at risk of serious and potential lethal effects.

178.    Vioxx lacked appropriate warnings, and the packaging and labels used by Defendant were misleading, inaccurate, incomplete, and/or untimely.

179.    Defendant Merck violated its post-manufacture duty to warn which arose when Merck knew, or with reasonable care should have known, that Vioxx was injurious and sometimes fatal.

180.     At the time when consumers purchased and ingested Vioxx, Defendant Merck intended that others would rely upon the concealment, suppression or omission of the risks of ingesting Vioxx.

181.     Defendant's actions in connection with the manufacture, distribution, and marketing of Vioxx as set forth herein evidence a lack of good faith, honesty in fact and observance of fair dealing so as to constitute unconscionable commercial practices.

182.     Defendant Merck acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

183.     As a proximate result of the acts of consumer fraud set forth above, Plaintiff's Decedent purchased an unsafe product and incurred monetary expense, risk and injury to himself as previously set forth herein.

**WHEREFORE,** Plaintiff demands judgment against Defendant Merck for compensatory, statutory and/or punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### COUNT V
### PLAINTIFF V. DEFENDANT MERCK & CO., INC.
### PUNITIVE DAMAGES

184.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

185.     The Plaintiff is entitled to punitive damages because the Defendant Merck acted maliciously and/or with a purpose to disregard the Plaintiff's rights or was aware that its conduct was substantially certain to result in Plaintiff's rights being disregarded. The Defendant misled both the medical community and the public at large, including the Plaintiff's Decedent, by making false representations about the safety of Vioxx. Defendant Merck had knowledge that Vioxx was likely to cause serious and even fatal side effects to users.  Despite the knowledge that it possessed, Defendant Merck downplayed, understated and/or disregarded its knowledge of the serious and permanent side effects and risks associated with the use of Vioxx.

186.    Defendant Merck was or should have been in possession of evidence demonstrating that Vioxx caused serious side effects. Nevertheless, Defendant continued to market Vioxx by providing false and misleading information with regard to safety and efficacy.

187.    Defendant Merck failed to provide warnings that would have dissuaded physicians from prescribing Vioxx and consumers from purchasing and consuming Vioxx, thus depriving physicians and consumers from weighing the true risks against the benefits of prescribing and/or purchasing and consuming Vioxx.

**WHEREFORE,** Plaintiff demands judgment against Defendant Merck for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and all such other relief as the Court deems proper.

## COUNT VI
## PLAINTIFF V.  PFIZER INC., and PHARMACIA CORPORATION, STRICT PRODUCT LIABILITY CLAIM

188.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

189.    Defendants Pfizer and Pharmacia are the researchers, developers, manufacturers, distributors, marketers, promoters, suppliers and sellers of Bextra, which is defective and unreasonably dangerous to consumers.

190.    Alternatively, Bextra, manufactured and/or supplied by Defendants Pfizer and Pharmacia, was defective in design or formulation, such that when it was placed in the stream of commerce, it was unreasonably dangerous in that it was more dangerous than an ordinary consumer would expect and more dangerous that other anti-inflammatory drugs for Osteoarthritis which were available to Timothy E. Lichter.

191.    Bextra, manufactured by Defendants Pfizer and Pharmacia, was defective due to inadequate warnings or instructions since the manufacturers knew or should have known that the product

created a risk of harm to consumers, such as Plaintiff's Decedent, when used in the way it was intended to be used in a manner that was reasonably foreseeable by Defendants Pfizer and Pharmacia.

192.    Bextra, manufactured and supplied by Defendants Pfizer and Pharmacia, was defective due to inadequate warnings, inadequate testing, and inadequate post-marketing warnings and instructions, because after Defendants knew or should have known of the risk of injury from Bextra, they failed to provide adequate warnings to users or consumers of the product and continued to promote the product.

193.    Bextra was, at the time it left Defendants Pfizer's and Pharmacia's control, a defective product, unreasonably dangerous for use, resulting in injury to Plaintiff's Decedent, Timothy E. Lichter as herein alleged.

194.    The defective and unreasonably dangerous condition of Bextra was a proximate cause of the damages and injuries sustained by Plaintiff's Decedent Timothy E. Lichter.

195.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendants Pfizer and Pharmacia, Plaintiff's Decedent suffered profound injuries and death.

196.    Defendants Pfizer and Pharmacia failed to provide adequate warnings and/or information concerning the harms or potential harms and dangers of Bextra to persons administered the product, including but not limited to the Plaintiff's Decedent herein.

197.    Defendants Pfizer and Pharmacia manufactured, marketed, distributed and sold said product to Plaintiff's Decedent without providing information concerning the dangers and harms to persons administered the product.

198.    Defendants Pfizer and Pharmacia failed to perform adequate testing which would have established that Bextra possessed potentially serious side effects about which Defendants should have provided full and proper warnings.

199.    Defendants Pfizer and Pharmacia failed to warn physicians and users of Bextra of the aforementioned dangers and adverse side effects, and also failed to recommend and promote other safer treatments of disease.

200.     Bextra, manufactured and/or supplied by Defendants Pfizer and Pharmacia, was defective due to inadequate post-marketing warnings and/or instructions in that Defendants failed to provide adequate warnings to users and consumers of Bextra and continued to aggressively market this product after they knew or should have known of the risk of harm from the product.

201.     Bextra, manufactured and/or supplied by Defendants Pfizer and Pharmacia, was defective in design or formulation because at the time this product left the control of the manufacturers it was unreasonably dangerous to health, more dangerous than any ordinary consumer would expect and more dangerous than other treatments for Osteoarthritis and Rheumatoid Arthritis.

202.     Bextra was defective in design or formulation because when this product left the control of the manufacturer or supplier, its foreseeable risks exceeded the benefits to be derived from the use of this product.

203.     Defendants Pfizer's and Pharmacia's failure to warn of the risks and harms associated with Bextra was reckless and without regard for the public's safety and welfare. The Defendants misled both the medical community and the public at large, including Plaintiff's Decedent, by making false representations about the safety of the product. The Defendants downplayed, understated and/or disregarded their knowledge of the serious and permanent side effects associated with the use of the product despite available information demonstrating that this product was likely to cause serious and potentially fatal side effects to users.

204.     Defendants Pfizer and Pharmacia were or should have been in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless, Defendants continued to market the product by providing false and misleading information with regard to its safety and efficacy.

205.     As a direct and proximate result of one or more of these wrongful acts or omissions of Defendants Pfizer and Pharmacia, Plaintiff suffered profound injuries resulting in death; lost financial gains; was kept from ordinary activities and duties; and caused to experience mental and physical pain and suffering, disability and loss of enjoyment of life.

**WHEREFORE,** Plaintiff demands judgment against Defendants Pfizer and Pharmacia for all such compensatory, statutory and/or punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT VII**
**PLAINTIFF V. PFIZER INC., and PHARMACIA CORPORATION**
**NEGLIGENCE**

206.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

207.    Defendants Pfizer and Pharmacia owed a duty to Plaintiff to manufacture and sell Bextra in a safe manner, free from defects.

208.    Defendants Pfizer and Pharmacia were negligent in designing and manufacturing Bextra and by failing to provide adequate warnings to consumers about the risks and dangers of using Bextra.

209.    As a direct and proximate result of the conduct of Defendants Pfizer and Pharmacia as aforesaid, Plaintiff's Decedent suffered serious physical and emotional injuries resulting in his death, suffered economic loss, and has otherwise been physically, emotionally and economically injured.

**WHEREFORE,** Plaintiff demands judgment against Defendants Pfizer and Pharmacia for compensatory, statutory and/or punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT VIII**
**PLAINTIFF V. PFIZER INC., and PHARMACIA CORPORATION**
**BREACH OF WARRANTY**

210.    Plaintiff incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

211.    Defendants Pfizer and Pharmacia placed Bextra into the stream of commerce for sale and recommended its use to physicians, the FDA and consumers without adequately warning physicians, the FDA and consumers, including the Plaintiff's Decedent, Timothy E. Lichter, of the risks associated with the use of Bextra.

38

212.    Defendants Pfizer and Pharmacia had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion, sale and release of Bextra including a duty to:  ensure that the product did not cause the user unreasonably dangerous side effects, warn of dangerous and potentially fatal side effects and disclose adverse material facts when making representations to physicians, the FDA and the public at large, including the Plaintiff's Decedent.

213.    When Plaintiff's Decedent's physician prescribed Bextra, and Plaintiff's Decedent made the decision to use Bextra, both Plaintiff's Decedent and his physicians reasonably relied upon the Defendants and its agents to disclose known defects, risks, dangers, and side effects of Bextra.

214.    Plaintiff's Decedent's physicians, the FDA and/or Plaintiff's Decedent had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning Bextra when Plaintiff's Decedent's physician prescribed and/or otherwise provided Bextra and Plaintiff's Decedent purchased and used Bextra as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released in the stream of commerce by the Defendants Pfizer and Pharmacia.  Plaintiff's Decedent justifiably and detrimentally relied on the warranties and representations of the Defendants in the purchase and use of Bextra.

215.    Defendants Pfizer and Pharmacia were under a duty to disclose the defective and unsafe nature of Bextra to physicians, the FDA, consumers and users, such as Plaintiff's Decedent.  Defendants had sole access to material facts concerning the defects and Defendants knew that physicians, the FDA and users, such as Plaintiff's Decedent, could not have reasonably discovered such defects.

216.    By the conduct alleged and by operation of law, Defendants Pfizer and Pharmacia, their agents and employees extended various warranties to Plaintiff's Decedent and Plaintiff's Decedent's physician including, without limitation, that Bextra was merchantable, fit for the purpose intended and that it was designed and manufactured in accordance with good design and industry standards.

217.    Defendants Pfizer and Pharmacia breached the above warranties in that Bextra was not safe and effective as a medication for arthritis and pain, as Defendants had represented, it was defective as

set forth herein, and it was not designed, manufactured or sold in accordance with good design and industry standards.

218.     As a direct and proximate result of the conduct of Defendants Pfizer and Pharmacia as aforesaid, Plaintiff's Decedent suffered serious physical and emotional injuries resulting in his death, suffered economic loss, and has otherwise been physically, emotionally and economically injured.

**WHEREFORE,** Plaintiff demands judgment against Defendants Pfizer and Pharmacia for compensatory, statutory and/or punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

<u>**COUNT IX**</u>
<u>**PLAINTIFF V.  PFIZER INC., and PHARMACIA CORPORATION**</u>
<u>**CONSUMER FRAUD**</u>

219.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

220.     Defendants Pfizer and Pharmacia are the researchers, developers, designers, testers, manufacturers, inspectors, labelers, distributors, marketers, promoters, and sellers of Bextra and/or otherwise released Bextra into the stream of commerce.

221.     Defendants Pfizer and Pharmacia knew or should have known that the use of Bextra causes serious and life threatening injuries but failed to warn the public, including Plaintiff's Decedent Timothy E. Lichter of same.

222.     Defendants Pfizer and Pharmacia made untrue, deceptive or misleading representations of material facts to, and omitted and/or concealed material facts from, Plaintiff's Decedent, Timothy E. Lichter, in product packaging, labeling, medical advertising, direct-to-consumer advertising, promotional campaigns and materials, among other ways, regarding the safety and use of Bextra.  Moreover, Defendants downplayed and/or understated the serious nature of the risks associated with Bextra in order to increase the sales of Bextra and secure a greater share of the relevant market.

223.    Defendants Pfizer's and Pharmacia's statements and omissions were undertaken with the intent that the FDA, physicians and consumers, including Plaintiff's Decedent, would rely on Defendants' statements and/or omissions.

224.    Defendants Pfizer and Pharmacia knew of the growing public acceptance of its misinformation and misrepresentation regarding the safety and efficacy of Bextra but remained silent because their appetite for significant future profits far outweighed their concern for the health and safety of the public, including Plaintiff's Decedent Timothy E. Lichter.

225.    Plaintiff's Decedent's physician prescribed and/or otherwise provided Bextra, and Plaintiff's Decedent consumed Bextra for personal health reasons and suffered ascertainable losses of money as a result of Defendants Pfizer's and Pharmacia's use or employment of the improper methods, acts, or practices alleged herein.

226.    The aforesaid promotion and release of Bextra into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentation, and/or knowing concealment, suppression, or omission of material facts with the intent that others would rely upon such concealment, suppression or omission in connection with the sale or advertisement of such merchandise or services by Defendants Pfizer and Pharmacia, in violation of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.* and/or other federal, state or local laws, regulations or common law that may be applicable concerning consumer fraud, deceptive trade practices, misrepresentation or similar matters.

227.    Defendants Pfizer and Pharmacia concealed, omitted, or minimized the side effects of Bextra or provided misinformation about adverse reactions, risks and potential harms from Bextra and succeeded in persuading consumers to purchase and ingest Bextra despite the lack of safety and the risk of adverse medical reactions, including cardiovascular events and gastrointestinal effects.

228.    Defendants Pfizer's and Pharmacia's practice of promoting and marketing Bextra created and reinforced a false impression as to the safety of Bextra, thereby placing consumers at risk of serious and potentially lethal side effects.

41

229.    Bextra lacked appropriate warnings, and the packaging and labels used by Defendants were misleading, inaccurate, incomplete, and/or untimely.

230.    Defendants Pfizer and Pharmacia violated their post-manufacture duty to warn which arose when they knew, or with reasonable care should have known, that Bextra was injurious and sometimes fatal.

231.    At the time when consumers purchased and ingested Bextra, Defendants Pfizer and Pharmacia intended that others would rely upon their concealment, suppression or omission of the risks of ingesting Bextra.

232.    Defendants Pfizer's and Pharmacia's actions in connection with manufacturing, distributing, and marketing Bextra as set forth herein evidence a lack of good faith, honesty in fact and observance of fair dealing so as to constitute unconscionable commercial practices.

233.    Defendants Pfizer and Pharmacia acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

234.    As a proximate result of the acts of consumer fraud set forth above, Plaintiff's Decedent purchased an unsafe product and incurred monetary expense, risk and injury to himself as previously set forth herein.

**WHEREFORE,** Plaintiff demands judgment against Defendants Pfizer and Pharmacia for compensatory, statutory and/or punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### COUNT X
### PLAINTIFF V.  PFIZER INC., and PHARMACIA CORPORATION
### PUNITIVE DAMAGES

235.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

236.    The Plaintiff is entitled to punitive damages because Defendants Pfizer and Pharmacia acted maliciously and/or with a purpose to disregard the Plaintiff's rights or were aware that their conduct

was substantially certain to result in Plaintiff's rights being disregarded. Defendants misled both the medical community and the public at large, including Plaintiff's Decedent herein, by making false representations about the safety of Bextra. Defendants downplayed, understated and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Bextra despite available information demonstrating that Bextra was likely to cause serious and even fatal side effects to users.

237.    Defendants Pfizer and Pharmacia were or should have been in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless, Defendants Pfizer and Pharmacia continued to market Bextra by providing false and misleading information with regard to safety and efficacy.

238.    Defendants Pfizer and Pharmacia failed to provide warnings that would have dissuaded physicians from prescribing Bextra, and consumers from purchasing and consuming Bextra, thus depriving physicians and consumers from weighing the true risks against the benefits of prescribing and/or purchasing and consuming Bextra.

**WHEREFORE,** Plaintiff demands judgment against Defendants Pfizer and Pharmacia for compensatory damages and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT XI
PLAINTIFF v. ALL DEFENDANTS
WRONGFUL DEATH**

239.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

240.    Plaintiff Ruth Anne Lichter, as Decedent's surviving wife, is entitled to damages for the wrongful death of the Decedent, including without limitation, loss of his services, society, companionship and consortium, as well as pecuniary loss and medical and funeral expenses.

**WHEREFORE,** Plaintiff demands judgment against all Defendants for an award of compensatory and statutory damages, together with costs, disbursements and attorneys' fees and all such other relief as the Court deems proper.

**COUNT XII**
**PLAINTIFF v. ALL DEFENDANTS**
**SURVIVAL ACTION**

241.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

242.    As a result of the acts and/or omissions of the Defendants as set forth herein, Decedent suffered serious emotional and bodily injuries resulting in his death on May 29, 2004.

243.    Plaintiff Ruth Anne Lichter, on behalf of the Decedent's Estate, is entitled to recover damages as Plaintiff Decedent would have if he were living, including without limitation, compensatory, statutory and punitive damages against Defendants.

**WHEREFORE,** Plaintiff demands judgment against all Defendants for compensatory damages, statutory and/or punitive damages, together with costs, disbursements and attorneys' fees and all such other relief as the Court deems proper.

**RELIEF REQUESTED AS AGAINST ALL DEFENDANTS**

**WHEREFORE,** Plaintiff demands judgment against all Defendants as follows:

a.    Awarding wrongful death and compensatory damages against all Defendants in a fair and reasonable amount;

b.    Awarding statutory damages against all Defendants pursuant to all applicable state, federal or other laws;

c.    Awarding punitive damages against all Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter similar wrongful conduct in the future;

d.    Awarding costs, disbursements and attorneys' fees and all such other relief available under all applicable state, federal or other laws;

  e.  Awarding such other and further relief as the Court may deem just and proper.

Dated: May 23, 2007.

         s/Willard P. Techmeier     
         Willard P. Techmeier Bar Number:  1014112
         Attorney for Plaintiff
         The Techmeier Law Firm S.C.
         Chase Tower
         111 East Wisconsin Avenue, Suite 1760
         Milwaukee, WI  53202
         Telephone:  (414) 223-1050
         Fax:  (414) 223-4355
         E-mail:  wtechmeier@techmeier.com